UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:12-CR-49-TLS |
| | ) | |
| ANTONIO BURGOS, SR. | ) | |

**SENTENCING OPINION**

On July 25, 2012, the Government filed a three-count Indictment [ECF No. 1] against the Defendant, Antonio Burgos, Sr., charging him with passing and uttering a fictitious check, in violation of 18 U.S.C. § 514(a)(2) (Count 1); and utilizing interstate commerce to transport a fictitious check, in violation of 18 U.S.C. § 514(a)(3) (Counts 2 and 3). The case proceeded to a three-day jury trial from November 4–6, 2014, at which the Defendant appeared pro se, along with court-appointed standby counsel, Attorney Thomas N. O'Malley.[1] The jury convicted the Defendant on all three counts. In preparation for sentencing, the United States Probation Office prepared a Presentence Investigation Report (PSR), calculating the applicable guideline range for the Defendant's offense as 21 to 27 months of imprisonment. For the reasons stated in this Opinion and Order, the Court finds that a sentence of time served, followed by a term of supervised release, is sufficient, but not greater than necessary, to satisfy the purposes of sentencing.

---

[1] Per the Court's request, on May 8, 2013, a clinical and forensic psychologist submitted a sealed report [ECF No. 46], in which he concluded that the Defendant is "free from a mental disease which . . . would demonstrably impair his ability to participate in legal proceedings." In light of these findings, coupled with the Government's confirmation that it had no issues concerning the Defendant's ability to represent himself at trial, the Court determined that no further evidentiary hearing was necessary [ECF No. 51]. Consequently, the Defendant chose to represent himself at trial. *See Godinez v. Moran*, 509 U.S. 389 (1993) (finding that any defendant competent to stand trial is also competent to represent himself).

# BACKGROUND

The Defendant—a 56-year-old resident of Fort Wayne, Indiana—was born in Chicago, Illinois and is a member of the Moorish Science Temple of America.[2] His convicted offenses relate to three fictitious checks, each of which was either presented or transmitted by the Defendant in March 2011.

To commit the offenses, on February 28, 2011, the Defendant ordered customized personal checks from Carousel Checks, Inc., a company that sells financial products. The checks, which contained illustrations of Ancient Egyptian Pharaohs and were pre-printed with the words "Non-Domestic without US" under the Defendant's pre-printed name and address, were purportedly issued under the authority of the "Federal Resesrve (sic) Bank" in Richmond, Virginia. (*See* Gov. Exs. 10–13.) The checks also contained a stamp, which said "EZ Shield Check™ Fraud Protection," along with a checking account number and routing number.[3]

On March 11, 2011, the Defendant transmitted by mail two of the customized checks—one to his adult daughter, Khalia Burgos, for $20,000, and one to Khalia's mother, Rita Armstrong, for $40,000. The Defendant signed both checks as "Agent Antonio Burgos, Sr." According to Khalia, who graduated from Southern Illinois University in August 2010, she received her $20,000 check on March 13, 2011. The check's memo line indicated that it was for

---

[2]The Moorish Science Temple is a religious organization that teaches that the United States courts lack jurisdiction over its members, among other theories. *United States v. Arrambide*, 466 Fed. App'x. 545, at *1 (7th Cir. 2012) (unpublished table decision). As such, throughout his multiple pre-trial filings and at various points throughout trial, the Defendant has claimed that this Court lacks jurisdiction over him because he considers himself to be a Moorish National and Moorish-American Aboriginal. The Court has rejected this argument. (ECF No. 57.)

[3]The Defendant also used this purported checking account information to order the customized checks from Carousel. The payment of $53.36 failed, and Carousel was never reimbursed for these funds.

"Tuition." After an unsuccessful attempt at contacting the Defendant, Khalia deposited the check, along with $100 in cash, into her checking account at TCF Bank. But when Khalia returned home, she was informed by her mother, Rita, that the Defendant had sent Rita a $40,000 check, dated March 11, 2011, along with the following note:

> Rita - Deposit this check into your checking account for re-payment of [Khalia's college] tuition [at] SIU. Thank you for all of your support. You have been a great help. P.S. There is a typo on the check, but it is still good. Love, Truth, Peace, Freedom & Justice. Noble Moadeeb Ben-Burgos-El, EX REL Antonio Burgos Sr.

(Gov. Ex. 9 (minor alterations from original).) Believing that both checks were fraudulent,[4] Rita, accompanied by her daughter, drove to the TCF branch where Khalia deposited her check. A bank employee informed them that the $20,000 check had been submitted for processing and was no longer retrievable. Although the check was eventually returned as unpaid, TCF closed Khalia's account in accordance with internal policy. Khalia filed a police report, and soon thereafter, re-opened her TCF checking account. According to the testimony received at trial, Khalia did not suffer any adverse financial consequences as a result of the check. (Trial Tr. 96, Nov. 4, 2014.)

The third customized check was presented on March 15, 2011, when the Defendant

---

[4]At trial, Rita described her reaction upon receiving the $40,000 check:

> [The envelope] was quite odd, but I kind of recognized the writing, the odd writing believed to be [the Defendant], my daughter's father. I immediately opened the letter and read what it appeared to be, a scribbling of a payment for college tuition and for me being a good mother. Then I looked at an odd check in the amount of $40,000, which I immediately knew that there was some problems, because I knew financially [the Defendant] had never had this kind of money, but then as I investigated to check, I noticed that it was from the—I can't recall the bank, but a bank that citizens of—don't have, that he would not have had a bank account there.

(Trial Tr. 95, Nov. 4, 2014.)

3

attempted to open a checking account with 1st Source Bank in Fort Wayne, Indiana. The Defendant presented to a bank employee a $10,000 check (also signed by the Defendant as "Agent Antonio Burgos, Sr"), a driver's license, and a document purportedly showing that the Defendant had changed his name to Noble Moadeeb Ben Burgos-El. The bank employee, who was suspicious of the check's validity, described her interaction with the Defendant: "I questioned [the Defendant regarding] the Federal Reserve Bank and [he said] it was part of, something . . . called illuminating minds and that the Government owed us money and we had rights to the funds." (Trial Tr. 50, Nov. 4, 2014.) The bank employee contacted a teller, who noticed that "Federal Reserve Bank" was misspelled. The teller then contacted the Federal Reserve Bank in Richmond, Virginia, and was informed that individual checking accounts are not available through the Federal Reserve Bank. The teller's supervisor ultimately determined that the check was invalid, and as a result, placed a hold on the check and closed the Defendant's account.[5]

Following an investigation, the Government filed a three-count Indictment against the Defendant on July 25, 2012. The Defendant was then arrested on October 18, 2012, and released on pre-trial supervision that same day. According to the United States Probation Office, aside from a positive drug test for marijuana on December 3, 2012, the Defendant has complied with

---

[5]At trial, the bank supervisor described her reaction upon receiving the check:

[Bank supervisor: The teller] did not feel that [the check] was valid, and I also agreed that it was not valid. . . . [Government Attorney:] What was the concern about the check not being valid? What particularly did you believe made the check not valid? [Bank supervisor:] The check is . . . made out from the Federal Reserve Bank. The word "reserve" is also misspelled, and the Federal Reserve Bank does not issue personal checks. There are no personal bank accounts issued against the Federal Reserve Bank.

(Trial Tr. 39, Nov. 4, 2014.)

the terms of pre-trial supervision.

**ANALYSIS**

When sentencing a defendant, the district court "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a)." *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see United States v. Panice*, 598 F.3d 426, 441 (7th Cir. 2010) (citing *Nelson*, and setting forth the two-step process that a sentencing court must engage in to determine a defendant's sentence). When calculating the guideline range, "[a] district court may rely on facts asserted in the PSR if the PSR is based on sufficiently reliable information." *United States v. Rollins*, 544 F.3d 820, 838 (7th Cir. 2008). "The defendant bears the burden of proving that the PSR is inaccurate or unreliable," and if he offers no evidence to question the PSR's accuracy, the Court may rely on it. *Id*.

Here, the PSR includes a base offense level of seven under U.S.S.G. § 2B1.1(a)(1). It also includes an enhancement of eight levels, pursuant to § 2B1.1(b)(1)(E), because the "loss" resulting from the Defendant's offense was more than $70,000, but less than $120,000. *See* Application Note 3(A), § 2B1.1 ("loss is the greater of the actual loss or intended loss.") To reach this calculation, the Probation Officer credited an intended loss of $70,000 for the three fraudulent checks ($10,000 + $20,000 + $40,000). *United States v. Black*, 798 F.3d 570, 575 (7th Cir. 2015) ("Under § 2B1.1, in a typical case involving passing fraudulent checks, district courts routinely calculate a general loss amount by adding the value of each check."). The Probation Officer then added an actual loss of $53.36 for the Defendant's failed payment to Carousel and

an additional intended loss of $5,023.07 for the Defendant's alleged attempt to pay back an IRS obligation.[6] This yielded a total offense level of 15. In addition, based on his 2011 felony conviction for the possession of marijuana, the Defendant has a criminal history category of II. The Defendant's criminal history category of II, coupled with a total offense level of 15, results in an advisory guideline range of 21 to 27 months of imprisonment.

### A.     Downward Variance Under § 3553(a)

In imposing a sentence, § 3553(a) requires a court to consider the nature and circumstances of the offense and the history and characteristics of the defendant, and impose a

---

[6] The additional intended loss of $5,023.07 is based on a document the Defendant sought to admit (albeit unsuccessfully) at trial. In particular, the document is a billing notice from the IRS, dated July 15, 2013, on which the Defendant wrote, in part, the following:

> NON-NEGOTIABLE CHARGEBACK. OFFICE HOLDER SECRETARY OF THE TREASURY. ACCEPTED FOR VALUE ALL RELATED ENDORSEMENTS IN ACCORDANCE WITH UCC-3-419, HJR-192, AND PUBLIC LAW 73-10. CHARGE MY PRIVATE UCC CONTRACT TRUST ACCOUNT EXEMPTION IDENTIFICATION NUMBER FOR THE REGISTRATION FEES . . . [and] CHARGE THE SAME TO THE DEBTOR'S ORDER OR YOUR ORDER. PRE-PAID COMMON STOCK/PRIORITY/EXEMPT FROM LEVY.

(Def's Ex. 100). The document, which the Defendant signed and dated July 23, 2013, contains a checking account number and routing number that matches the numbers included on the three fraudulent checks.
    According to the PSR, this document and other information provided by the Government show that the Defendant "attempted to use the account alleged to exist at the Federal Reserve Bank to pay" his IRS obligation of $5,023.07. (PSR ¶ 17.) While the Court is instinctively reluctant to use this document—which is clearly bogus—as a basis for adding to the Defendant's loss total under § 2B1.1, the Guidelines have instructed otherwise. *See United States v. Stockheimer*, 157 F.3d 1082, 1090 (7th Cir. 1998) ("The operative concept in determining the offense level is simply the 'intended loss.' The only hint of the relevance of economic reality in the text of the guideline and commentary is in the provision allowing a downward departure for transparently bogus schemes.") (emphasis omitted). Therefore, the Court will address this issue when it analyzes the sentencing factors under § 3553(a).

sentence that is sufficient, but not greater than necessary, to satisfy the purposes of sentencing: adequately capturing the seriousness of the offense, providing just punishment, promoting respect for the law, affording adequate deterrence, protecting the public, and rehabilitating the defendant. In making this determination, a district court may not presume that the Guidelines sentence is the correct one. *Nelson*, 555 U.S. at 352; *Rita v. United States*, 551 U.S. 338, 351 (2007). Ultimately, a district court must make an independent determination, taking into account the types of sentences available, the other relevant § 3553(a) factors, and the arguments of the parties. *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). "[A] district court can vary categorically from every guideline, including the career offender guidelines." *United States v. Redmond*, 667 F.3d 863, 876 (7th Cir. 2012) (citing *United States v. Corner*, 598 F.3d 411 (7th Cir. 2010)).

After careful consideration of the sentencing factors in § 3553(a) and all of the information available at sentencing, the Court finds that the advisory guideline range of 21 to 27 months imprisonment is a disproportionate sentence for this particular defendant, and that a downward variance is appropriate. The Court explains its reasoning below.

**1.** *Nature and Circumstances of the Offenses*

First, the Defendant's advisory guideline range—and in particular, his eight-level enhancement under U.S.S.G. § 2B1.1 for the amount of "loss" involved—overstates the severity of his offense conduct.

The base offense level for fraud crimes, like the one committed by the Defendant, is impacted by the amount of loss involved, which is considered a "specific offense characteristic."

7

*See* § 2B1.1. According to this guideline section, the Defendant's base offense level is seven, but is then subject to graduated increases based on the amount of loss attributed to the Defendant. For example, a loss of more than $5,000 results in the addition of two levels, more than $10,000 adds four levels, more than $30,000 adds six levels, and more than $70,000 adds eight levels. § 2B1.1(b)(1) (calling for an increase in the offense level for as many as 30 levels when the loss is more than $400 million). Application Note 3(A) to § 2B1.1(b) also states the general rule that "loss is the greater of the actual loss or intended loss." Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense," § 2B1.1, Application Note 3(A)(i), and in turn, "reasonably foreseeable pecuniary harm" is the "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, Application Note 3(A)(iv).

Notwithstanding, the Guidelines provide that "[t]here may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense," and "[i]n such cases, a downward departure may be warranted." Application Note 20(C), § 2B1.1; *United States v. Corry*, 206 F.3d 748, 751 (7th Cir. 2000) (noting that if the loss amount significantly overstates the seriousness of a defendant's conduct, this is "an encouraged basis for departure.").[7]

In *United States v. Roen*, a case involving a defendant's passing of fraudulent checks on a closed bank account, the court described a scenario—based on the so-called "economic reality"

---

[7]Although the concept of a downward departure has been rendered obsolete by *United States v. Booker*, 543 U.S. 220 (2005), *see United States v. Dale*, 498 F.3d 604, 611 n.6 (7th Cir. 2007), the Court may consider Application Note 20(C) when analyzing the § 3553(a) factors. *See United States v. Rosen*, 726 F.3d 1017, 1027 (7th Cir. 2013) ("a 'court can consider the amount of variance between the intended loss and the realistic possibility of loss when considering an appropriate sentence.'") (quoting *United States v. Portman*, 599 F.3d 633, 640 (7th Cir. 2012))).

principle—in which a downward variance may be warranted:

> [This] arises when the court adopts a figure based largely or solely on intended loss. . . . In some cases, as where a defendant devises an ambitious scheme obviously doomed to fail and which causes little or no actual loss, it may be unfair to sentence the defendant based on the intended (but highly improbable) loss determination from the § 2B1.1 table; the intended loss bears no relation to "economic reality."

279 F. Supp. 2d 986, 991 (E.D. Wis. 2003) (citing *Stockheimer*, 157 F.3d at 1089 (stating that the court should evaluate the "economic reality" of a scheme in considering a downward departure); *United States v. Coffman*, 94 F.3d 330, 336–337 (7th Cir. 1996) ("[T]he place for mitigation on the basis of a large discrepancy between intended loss and probable loss is, under the guidelines, in the decision whether to depart downward.")) (citation omitted). When applying the "economic reality" principle to the defendant's advisory guideline range, the court ultimately determined that a nine-level downward departure was appropriate:

> First, the [defendant's bank] account was closed within days of being opened; none of the checks defendant wrote on the account were honored; and none of the recipients of those checks provided defendant with goods or services in exchange. Although defendant's scheme was not so improbable as to defeat a finding of intent, it was such that the amount of loss bore little or no relation to economic reality. . . . Second, the discrepancy between the actual loss—$19,000—and the intended loss—over $1.2 million—was extreme.

*Id.* at 991–992; *cf. United States v. Portman*, No. 04 CR 64, 2007 WL 3231438, at *4 (N.D. Ill. Oct. 26, 2007) (finding that the defendant's case is distinguishable from *Roen* because "[f]or the most part, the banks did accept for deposit [the defendant's] forged checks, and on numerous occasions allowed him to withdraw some of the deposited funds.").

Here, similar to the factual scenario in *Roen*, none of the Defendant's three checks were honored, and none of the recipients of those checks provided the Defendant with goods or services in exchange. After the Defendant deposited the $10,000 check at 1st Source Bank, a

9

bank supervisor placed an immediate hold on the check. The check was then reversed and the Defendant's account was closed as a result. As to the $20,000 check, although it was processed by TCF Bank, no money was withdrawn and the check was eventually returned as unpaid. But more notably, the Defendant's three checks—which were drawn from the "Federal Resesrve (sic) Bank"—were transparently bogus, as evidenced from the testimony of Rita Armstrong and the 1st Source Bank supervisor. (*See* Trial Tr. 95, Nov. 4, 2014 ("[Rita Armstrong]: I looked at an odd check in the amount of $40,000, which I immediately knew that there was some problems, because I knew financially [the Defendant] had never had this kind of money, but then as I investigated to check, I noticed that it was from [Federal Reserve Bank where individuals do not have accounts]."); Trial Tr. 39, Nov. 4, 2014 ("[Bank supervisor: The teller] did not feel that [the check] was valid, and I also agreed that it was not valid [because the check is] made out from the Federal Reserve Bank. The word 'reserve' is also misspelled, and the Federal Reserve Bank does not issue personal checks. There are no personal bank accounts issued against the Federal Reserve Bank.").) Even more spurious, however, is the Defendant's hand-written "non-negotiable chargeback" to the IRS, which added $5,023.07 to the Defendant's intended loss total.

Moreover, in comparison to *Roen*—which involved $19,000 in actual losses—the actual losses here ($53.36) are exceedingly minimal. It is therefore no surprise that Carousel, the only victim who suffered actual losses, has not sought restitution or any other claims against the Defendant. And further, while the court in *Roen* found that the intended loss—which was over 65 times greater than the actual loss—created an "extreme" discrepancy, the discrepancy in this case is far more extreme, as the intended loss is nearly 1,406 times greater than the actual loss.

10

Thus, the Defendant's scheme, which was not so improbable as to defeat a finding of intent, nevertheless resulted in an amount of loss that "bore little or no relation to economic reality." *Roen*, 279 F. Supp. 2d at 992.

The Court should also note that, unlike other federal fraud cases—which typically involve extensive conduct over a lengthy period of time, *see, e.g.*, *United States v. Johnson*, 161 Fed. App'x. 600, 601 (7th Cir. 2006) (unpublished table decision) (finding that no argument can be made for a downward variance under § 3553(a) because the Defendant, "for more than a year . . . provided hundreds of counterfeit checks that were used in [a] fraudulent check-cashing scheme . . . [and] received 50% of its illegal profits."); *United States v. Anderson*, 97 F.3d 1454, at *1 (7th Cir. 1996) (unpublished table decision) (finding that a 42-month sentence is appropriate because the defendant used her employer's funds to write 60 fraudulent checks totaling approximately $545,000)—this case, by comparison, involves the passing of three checks over a four-day period.

Accordingly, in light of the above factors (i.e., the minimal actual losses; the transparently bogus nature of the Defendant's fraudulent checks; the extreme discrepancy between the intended and actual losses; and the extent and duration of the Defendant's offense conduct), the Court finds that the advisory guideline range overstates the severity of the Defendant's offense conduct, and that a mitigated sentence is justified.

**2.** *History and Characteristics of the Defendant*

A mitigated sentence is further supported by the history and characteristics of the Defendant. Aside from the Defendant's age (56 years old) and relatively minimal criminal

history (one felony conviction for the possession of marijuana),[8] the Court finds particularly noteworthy the Defendant's substantial compliance with the terms of pre-trial supervision, which he has served under for over three years. The Defendant's compliance on pre-trial supervision suggests his ability to avoid criminal conduct, without a need for a term of imprisonment.

3. *Five-Level Downward Variance*

In consideration of the § 3553(a) factors—including the nature and circumstances of the Defendant's offenses and the history and characteristics of the Defendant—the Court determines that a five-level downward variance is warranted here, and that a sentence of time served, followed by a period of supervised release, is sufficient, but not greater than necessary, to satisfy the purposes of sentencing. This determination is based on the evidence in the record thus far. The Court has not yet heard from the Defendant, and he may wish to make a statement on his own behalf in mitigation of punishment. Indeed, he is entitled to make such a statement, as is the Government. *See* Fed. R. Crim. P. 32(i)(4)(A)(ii)-(iii). Therefore, the Court reserves a determination of the appropriate sentence until after the Defendant and the Government have had an opportunity to address the Court.

---

[8] According to the PSR, from 1983–2011, the Defendant used marijuana for "pain management." (PSR ¶ 54). The Defendant told the Probation Officer that he suffers from back, neck, and knee pain, all resulting from a car accident and a sports injury suffered while the Defendant was playing Double-A professional baseball in 1983. (*Id.* at 52, 54.)

**CONCLUSION**

For the reasons stated above, the Court GRANTS the Defendant a five-level downward variance, but WITHHOLDS determining the sentence to impose until the time of the sentencing hearing and after providing the Defendant and the Government an opportunity to address the Court. The sentencing hearing scheduled for October 26, 2015, at 1:30 PM, is CONFIRMED.

SO ORDERED on October 23, 2015.

 s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT